# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

BRANDI LYNN HOLDER,    )
#313870,    )
   )   CIVIL ACTION NO. 9:14-4589-DCN-BM
      Petitioner,    )
   )
v.    )   **REPORT AND RECOMMENDATION**
   )
ANGELIA RAWSKI,    )
   )
      Respondent.    )
_____)

Petitioner, an inmate with the South Carolina Department of Corrections, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was filed on December 3, 2014. The Respondent filed a return and motion for summary judgment on January 29, 2015, and after receiving extensions of time to respond, Petitioner filed a memorandum in opposition on May 5, 2015. This matter is now before the Court for disposition.[1]

## Procedural History

Petitioner was indicted in Greenville County in December 2005 for homicide by child abuse [Indictment No. 03-GS-23-1307]. (R.pp. 735-736). Petitioner was represented by Bruce A. Byrholdt, Esquire, and David E. Phillips, Esquire. After a jury trial on February 6-9, 2006, Petitioner

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(c)and (e), D.S.C. The Respondent has filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.



was found guilty as charged. (R.pp. 639, 734-735). Petitioner was then sentenced to twenty-five (25) years imprisonment. (R.pp. 701, 734-735).

Petitioner filed a timely appeal. See, Respondent's Attachment 2. She was represented on appeal by Robert Dudek of the South Carolina Commission on Indigent Defense, Division of Appellate Defense, who raised the following issues:

**Ground One**: The court erred by allowing Investigator Kelly to relate what co-defendant Martucci told him during interrogation. Appellant was denied her Sixth Amendment right to confront and cross-examine Martucci, and the redaction of Martucci's statement to Kelly did not remove the *Bruton*[2] problem since the "she" Martucci accused of abusing the child was clearly and obviously appellant.

**Ground Two:** The court erred by allowing appellant's co-worker, Eccles, to testify that appellant began dressing differently, and in essence was far more interested in Martucci than her child once her relationship with Marucci began. This was inadmissible character evidence under Rule 404, SCRE since it was clearly offered to urge the jury to conclude appellant was acting in conformity with this bad trait of her character by putting her relationship with Martucci ahead of her own child's best interest.

**Ground Three**: The court erred by admitting the autopsy photographs of the decedent in this case []. State's Exhibits 13-15 of the surgically opened child during the autopsy were extraordinarily sickening, and meant to inflame the passions of the jury. The judge erred by ruling these photographs were admissible under Rule 403, SCRE. The probative value of these photographs, particularly State's exhibits 13-15 was far outweighed by their unduly prejudicial effect.

**Ground Four:** The judge erred by admitting the June, 2000, photographs of the decedent which suggested prior child abuse. State's Exhibits 16-17 were clearly meant to imply the child had been abused on a prior occasion or occasions, and they were not admissible to show a common scheme or plan or lack of accident. The relevant time of the injuries being inflicted was two to seventy-two hours before the child's death, and the state also did not prove prior child abuse in the photographs by clear and convincing evidence.

See Respondent's Attachment 3, pp. i-ii.

---

[2]Bruton v. United States, 391 U.S. 123 (1968).

2



On October 6, 2008, the South Carolina Supreme Court certified the case for review pursuant to S.C. Appellate Ct. R. 204(b). <u>See</u> Respondent's Attachment 4. Thereafter, on May 4, 2009, the South Carolina Supreme Court affirmed Petitioner's conviction and sentence. (R.pp. 703-714); <u>see also</u> <u>State v. Holder</u>, 676 S.E.2d 690 (S.C. 2009). The Remittitur was issued on May 20, 2009. (R.p. 715).

On April 20, 2010, Petitioner filed an application for post-conviction relief ("APCR") in state circuit court. <u>Holder v. State of South Carolina</u>, No. 2010-CP-23-3160. (R.pp.716-722). Petitioner originally raised the following issues in her APCR:

> **Ground One:** The [Petitioner] received Ineffective Assistance of Counsel prior and during her trial in violation of her rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 14 of the South Carolina Constitution.
>
> **Ground Two:** The judgment and sentence against the [Petitioner] were entered in violation of her right to due process of law and effective assistance of counsel.

(R.p. 718).

Petitioner subsequently filed an amendment and supplement to her PCR petition, setting forth thirty–five (35) specific ineffective assistance of counsel issues in addition to her two original grounds. (R.pp.728-731). Petitioner was represented in her APCR by Tara Dawn Shurling, Esquire, her counsel in the present habeas case, and an evidentiary hearing was held on Petitioner's application on April 4, 2012. (R.pp. 745-934). In an order filed June 25, 2012, the PCR judge denied relief on the allegations in the APCR. (R.pp. 975-995).

Petitioner filed a timely appeal of the PCR court's order, in which she continued to be represented by Ms. Shurling. In her Petition for Writ of Certiorari, Petitioner raised the following issues:



3

**Ground One:** Did the lower court err in denying the Petitioner relief where she met her burden of proof with regard to her allegations concerning the errors and omissions of trial counsel relating to the testimony of her ex-husband, James Darren Turner?

**Ground Two:** Was Defense Counsel ineffective for characterizing the Petitioner as "not the best wife" when cross-examining the Petitioner's ex-husband?

**Ground Three:** Did the lower court err in denying the Petitioner's Application for Post-Conviction Relief where the record below demonstrates trial counsel was ineffective for failing to point out to the jury in closing argument that the evidence that the [Petitioner] herself was sick the day before her son died with something that made her, like her son, throw up and therefore that she had every reason to believe the child's illness was from the same source as her own.

**Ground Four:** Did the lower court err in denying the Petitioner's Application for Post-Conviction where the record below demonstrates trial counsel was ineffective for failing to point out to the jury in closing argument that the testimony of multiple State witnesses concerning previous bruises observed on the victim in fact referenced only a few incidents recalled by multiple witnesses?

**Ground Five:** Did the lower court err in denying the Petitioner's Application for Post-Conviction Relief where record below supported her allegation that Defense Counsel was ineffective for failing to present numerous readily available character witnesses on behalf of the [Petitioner]?

**Ground Six:** Did the lower court err in denying the Petitioner's Application for Post-Conviction Relief where she demonstrated in the lower court that Defense Counsel was ineffective for neglecting to introduce evidence, specifically a SLED Forensic Services Lab Report, documenting that there was a mixed DNA sample taken from bite marks on the victim which yielded DNA not inconsistent with the victim *and* DNA from an unknown individual with XY Amelogenin meaning the DNA came from an unknown *male* contributor.

**Ground Seven:** The lower court erred in finding that the Petitioner was not entitled to relief where the record below supported her claim that defense counsel was ineffective for failing to object to a confusing and incomplete answer given by the trial court in response to a question from the jury concerning jury verdicts.[3]

---

[3]Petitioner's Petition actually had a different question posed in Ground Seven, and also included a Ground Eight. <u>See</u> Petition for Writ of Certiorari, p. 2 (Respondent's Exhibit Five). However, later in her application she states and addresses her final ground as set forth hereinabove. <u>Id</u>., at p.17

4



<u>Petition for Writ of Certiorari</u>, p. 2 (Respondent's Attachment Five).

The South Carolina Supreme Court denied certiorari on July 24, 2014, following which Petitioner moved for a rehearing. <u>See</u> Respondent's Attachments Six and Seven. The Petition for Rehearing was denied, and the Remittitur was filed on August 22, 2014. <u>See</u> Respondent's Attachment Eight.

In her Petition for writ of habeas corpus filed in this United States District Court, Petitioner raises the following issues:

> **Ground One:** Petitioner's right to confront all the witnesses against her, as guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution, as extended to the States by the Fourteenth Amendment, was violated when the Trial Court permitted a law enforcement officer to relate to the jury what Petitioner's co-defendant, Martucci, had told him during interrogation.

> **Ground Two:** The Petitioner's right to effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, was violated in the trial court when Trial Counsel made multiple errors and omissions in his handling of State witness, James Darren Turner, the Petitioner's ex-husband. Trial Counsel failed to object to irrelevant and highly prejudicial testimony, failed to make a motion to strike said testimony, failed to make a motion for curative charge or for a motion for a mistrial in the wake of this damaging testimony. Trial Counsel compounded the prejudice of these errors and omissions when he himself characterized the Petitioner as "*not the best wife*" when cross-examining this witness.

> **Ground Three:** The lower court err[sic] in denying the Petitioner's Application for Post-Conviction Relief where the record below demonstrates Trial Counsel violated her Sixth Amendment right to effective assistance of counsel by failing to adequately reference evidence in support of the defense in his closing arguments to the jury where he failed [to] point out to the jury that there was evidence that the Petitioner herself was sick the day before her son died with something that made her, like her son, throw up and therefore, that she had every reason to believe the child's illness was from the same source as her own. Likewise, in closing arguments Trial Counsel failed to draw the attention of the jury to the fact that the testimony of multiple State witnesses concerning bruises having been previously observed on the victim in fact referenced only a few incidents recalled by multiple witnesses.

> **Ground Four:** The lower court err[ed] in denying the Petitioner's Application for

5



post-Conviction Relief where record below supported her allegation that Defense Counsel violated her right to effective assistance of counsel, as protected by the Sixth and Fourteenth Amendments to the United States Constitution, by failing to present numerous readily available character witnesses on behalf of the [Petitioner].

**Ground Five:** The lower court erred in denying the Petitioner's Application for Post-Conviction Relief where she demonstrated in the lower court that her Sixth Amendment right to effective assistance of counsel was violated when Trial Counsel neglected to introduce evidence, specifically a SLED forensic Services Lab Report, documenting that there was a mixed DNA sample taken from bite marks on the victim which yielded DNA not inconsistent with the victim *and* DNA from an unknown individual with XY Amelogenin meaning the DNA came from an unknown *male* contributor.

**Ground Six:** The lower court err[ed] in denying the Petitioner's Application for Post-Conviction Relief where record below supported her allegation that her right to effective assistance of counsel, as protected by the Sixth and Fourteenth Amendments to the United States Constitution, was violated in the trial Court when Trial counsel failed to object to a confusing and incomplete answer given by the trial judge in response to a question from the jury concerning verdict options.

See Attachment to the Petition, pp.6-7, 11-15.

## Discussion

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 56, Fed.R.Civ.P; see Habeas Corpus Rules 5-7, 11. For the reasons set forth hereinbelow, the undersigned finds that the Respondent is entitled to summary judgment in this case.

## I.

## (Ground One)

In Ground One, Petitioner contends that her right to confront witnesses was violated when the trial court permitted Greenville County Sheriff's Office Investigator Doug Kelly to testify

6



as to what Petitioner's co-defendant, Mark Martucci, had told him during his interrogation.[4] Petitioner raised this issue in her direct appeal, where she had the burden of proof.

Kelly's testimony occurred during a joint trial in which Petitioner's co-defendant Martucci did not testify. (R.pp. 1-6). Petitioner contends that this testimony was introduced in violation of Bruton, 391 U.S. 123, which held that limiting instructions on use of a co-defendant's statement implicating the Defendant are not an adequate substitute at a joint trial for the Defendant's constitutional right of cross-examination. During Kelly's testimony at trial, he testified that Martucci told him "that he had been noticing bruising – bruises on [victim], and that he felt like she had been inflicting them." (R.p. 420). Kelly also testified that Martucci had stated that "the only time he saw her do anything was spanking his hand". (R.p. 421). Kelly testified that Martucci then went on to say "that he was not worried, that he had 50,000 witnesses that would say he had done nothing. And, at that point, no other conversation took place." (R.pp. 421-422).

> The Sixth Amendment guarantees criminal defendants the right to confront adverse witnesses. U.S. Const. amend. VI. Thus, in a joint trial, the Confrontation Clause prevents the admission of a co-defendant's pretrial confession that implicates another defendant unless the confessor testifies so as to permit cross-examination. Cruz v. New York, 481 U.S. 186, 189–190 (1987). The admission of such a confession cannot be cured by an instruction that a jury may only consider the confession against the confessor, and not against any other defendant. Bruton, 391 U.S. at 126, 135–137. This is because the lack of cross-examination pertaining to the statements leaves a jury in a position where it cannot "possibly be expected to forget [the statements] in assessing the defendant's guilt." United States v. Doherty, 233 F.3d 1275, 1283 (11th Cir.2000).

> If raised on direct appeal, a "Bruton violation requires a new trial unless the error was harmless beyond a reasonable doubt." United States v. Schwartz, 541 F.3d 1331, 1353 (11th Cir.2008) (citing Schneble v. Florida, 405 U.S. 427, 432 (1972)). "On collateral review, a federal constitutional error is harmless unless there is 'actual

---

[4]Although Petitioner and Martucci were both convicted of homicide by child abuse in the death of Petitioner's child, Martucci did not appear for trial, so his sentence was sealed.



prejudice,' meaning that the error had a 'substantial and injurious effect or influence' on the jury's verdict." Mansfield [v. Secretary, Dep't of Corrections], 679 F.3d [1301] at 1307 [(11th Cir. 2012)] (quoting Brecht [v. Abrahamson, 507 U.S. 619], 507 U.S. [619] at 637 [(1993)]). Therefore, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." Id. (quoting Brecht, 507 U.S. at 633–34).

Under the Brecht standard, the relevant inquiry is not simply whether the jury was right in its judgment, but "what effect the error had or reasonably may be taken to have had upon the jury's decision" and its impact on the jurors' minds in the total setting. Bonner v. Holt, 26 F.3d 1081, 1083 (11th Cir.1994) (quoting Kotteakos v. United States, 328 U.S. 750, 764 (1946)). A successful petition requires more than a reasonable possibility that the error contributed to the judgment. Mason v. Allen, 605 F.3d 1114, 1123 (11th Cir.2010)(per curiam). When analyzing the effect of a Confrontation Clause violation, we consider: (1) the importance of the testimony to the prosecution's case; (2) whether the testimony was cumulative; (3) the overall strength of the prosecution's case; (4) the frequency of the error; and (5) the presence or absence of evidence corroborating or contradicting the testimony on material points. Id. at 1123–24; Cargill v. Turpin, 120 F.3d 1366, 1375–76 (11th Cir.1997). Errors are harmless if there is significant corroborating evidence or the state's evidence of guilt is overwhelming. Guzman v. Sec'y, Dep't of Corr., 663 F.3d 1336, 1355 (11th Cir.2011). Conversely, errors are harmful if there are "significant weaknesses" in the case against the defendant. Id. at 1355–56. For example, a case has significant weaknesses if it "boils down" to a credibility contest. Id. A court is compelled to rule in a petitioner's favor if there is a " 'grave doubt' about the harmlessness of the error based upon the record." Id. at 1356.

Hull v. Secretary, Florida Dep't of Corrections, 572 Fed.Appx. 697, 701-702 (11th Cir. 2014).

As noted, this issue was raised in Petitioner's direct appeal. The state Supreme Court found that, although the introduction of the testimony did violate Bruton, the admission of the testimony was harmless. State v. Holder, 676 S.E.2d at 693-695. Specifically, the state Supreme Court held that,

[i]n the current appeal, [Petitioner] argues the substitution of her name with the pronoun "she" was insufficient to obscure her identity because the jury could readily determine that the statement referred to her as she was the only female defendant. We find the redaction in this case is analogous to that discussed in Gray [v. Maryland, 523 U.S. 185 (1998)] because, despite the redaction, it was apparent that Martucci was referring to [Petitioner], and this inference was one that could be readily made even

8



without reliance on the other testimony developed at trial. Thus, we find the admission of the redacted statement violated [Petitioner's] rights under the Confrontation Clause as Martucci did not testify and was not subject to cross-examination.

Holder, 676 S.E.2d at 694.

The undersigned agrees with the State Supreme Court that the introduction of this testimony was a violation of Bruton. (R.pp. 420-422). Therefore, the issue is whether its admission was harmless or not. The State Supreme Court held that it was harmless, because "it was established beyond a reasonable doubt that [Petitioner] was guilty of the offense of homicide by child abuse independent of the challenged statement so the error was harmless in the context of the entire record". Holder, 676 S.E.2d at 695. (R.p. 707). The State Supreme Court made this finding after reciting the substantial evidence of guilt against the Petitioner, and the undersigned can discern no reversible error in this decision.

The homicide by child abuse statue is broadly worded and provides that guilt may be established from an act or omission of abuse or neglect, or by inflicting injury or allowing the injury's infliction upon the child. S.C. Code Ann. § 16-3-85(A) and (B). Here, in her own statement to the police, Petitioner admitted to being aware of bruising, scratches and general injury to the child victim in the time leading up to the victim's death. She noticed a "bite mark" and other bruises, saw her co-defendant striking the victim on his legs at least ten times, and hitting the victim with his hands. (R.pp. 525-527). Petitioner heard "thuds" when her co-defendant was caring for the victim in another room the night before the victim died. Petitioner also stated that she had witnessed her co-defendant putting scotch tape on the victim's mouth and laughing about it and dunking the victim underwater during bath time to force him to stop crying. (R.pp. 523-529). During one bath time incident,



Petitioner's statement was that her co-defendant grabbed the victim by the back of the head and pushed his head down between his legs covering his face with water. (R.p. 529). Petitioner's own statements are highly probative of her knowledge that harm was being inflicted upon the two year old victim, and that she neglected to take any necessary steps to stop the abusive circumstances. Additionally, Parker testified that on at least one occasion a bath time incident included the victim's head being pushed underwater causing him to "swallow water almost like he was choking. . . [a]nd then no sooner - he would barely catch his breath and he would do it again." (R.p. 359). Parker further testified that Petitioner was aware of the water-dunking incidents. (R.pp. 358-359).

The evidence at trial also showed that Petitioner was at home with the victim for at least two days prior to his July 17 death. (R.pp. 318, 323). Petitioner did go to work on the day of the victim's death, even though she was aware that the victim "had thrown up all night." (R.pp. 284, 324). Dr. Michael Ward, an anatomic and forensic pathologist, testified about the extreme nature of the child's injuries, including trauma to the visceral organ of his abdomen with a tear in the small intestine, trauma to the pancreas, and bleeding into the abdominal cavity. (R.p. 226). Ward testified that the symptoms of such injury, namely those of shock, would have been detectable to a layperson. (R.pp. 214-227). Ward also testified that the injuries were sustained over a course of time, as there were two traumas to the internal organs, the first of which had begun to heal. (R.pp. 214-227). In addition, numerous witnesses, including Petitioner's neighbor and co-workers, testified to seeing bruises on the victim's body, a cut and swollen lip, and/or a burn mark, as well as other incidents where Martucci inflicted physical contact on the victim. (R.pp. 240, 249, 251-252, 280, 291, 295, 297, 306, 308, 317). Further, the emergency room nurse who admitted the victim noticed "marks on the right side of his face that were a very odd pattern that looked very much [] like knuckle prints,"



multiple bruises on his legs, on his arms," black eyes, scratches or abrasions around his mouth, and a "purple black mark" on his back, "all in different states of healing."  (R.pp. 140-142).

Based upon a review of the record and given the overwhelming evidence as to Petitioner's guilt, the undersigned does not find that Petitioner was prejudiced by the admission of Martucci's improperly redacted statement.  Any such error was harmless, and this claim is therefore without merit.  Brecht, 507 U.S. at 633–34); cf. Sanders v. Klem, 341 Fed.Appx. 839, 843 (3d Cir. Aug. 6, 2009)[Relief denied where, based upon the evidence at trial, admission of the statement did not have a substantial and injurious effect in determining the jury's verdict]; Lang v. Gundy, 399 Fed.Appx. 969, 976 (6th Cir. Oct. 14, 2010)[Finding that despite not being able to determine if a constitutional violation occurred, any potential error was harmless in light of the other evidence of petitioner's guilt].

## II.

In Grounds Two through Six, Petitioner raises numerous ineffective assistance of counsel claims which were all raised in her APCR, where Petitioner had the burden of proving the allegations in her petition.  Butler v. State, 334 S.E.2d 813, 814 (S.C. 1985), cert. denied, 474 U.S. 1094 (1986).  The PCR court rejected these claims, making relevant findings of fact and conclusions of law in accordance with S.C.Code Ann. § 17-27-80 (1976), as amended.  See Holder  v. State of South Carolina, No. 2010-CP-23-3160.  Petitioner also raised these claims in her PCR appeal to the State Supreme Court.  See Respondent's Exhibit Five.  Therefore, these claims are all properly exhausted.



The PCR judge found that:[5] 1) Petitioner's testimony provided factual details that she implied trial counsel should have used to counter the State's witnesses; 2) Petitioner testified that the victim only came with her to work twice and that she had no reason to doubt the co-defendant's explanation of the victim's bruise on one of these occasions as being the result of playing with the dog; 3) Petitioner testified that the victim never had burn marks, but instead suffered from eczema - which could look similar - and for which he had prescription cream; 4) Petitioner stated that counsel did not challenge Robin Center's testimony that she left the victim with Center overnight without warning; 5) Petitioner testified that she gave counsel a list of character witnesses, but was unsure if counsel contacted these witnesses for trial; 6) Petitioner stated that she briefly discussed the impact her second statement had on the case; 7) Petitioner stated that she told counsel "the situation" regarding the acts described in her statements to police but that they never asked her about it at trial; 8) Petitioner stated that her boyfriend started babysitting the victim while she was at work because he was unemployed; 9) Petitioner stated that she never saw the co-defendant harm the child; 10) Petitioner stated that the co-defendant told her about an ATV accident with the victim a few weeks before his death and that she believed him; 11) Petitioner stated that she did not discuss this with trial counsel but that she would have wanted to explain at trial why she believed her co-defendant that the victim was involved in another ATV accident; 12) Petitioner stated that she did not return home to check on the victim on the day he died (and instead had lunch with a friend) because her workplace was forty minutes away;

13) Dr. Rebecca Hartman testified that she practices straight chiropractic medicine;

---

[5]Factual findings of the PCR court which deal with issues not before this Court in this federal habeas petition are not included.

12



14) Hartman stated that she treated the victim every one to two weeks from when he was a week old (January 10, 2000) to approximately three [sic] weeks[6] before his death (April 8, 2002); 15) Hartman stated she never noticed any unusual bruises or abrasions on the victim and would have noted such; 16) Hartman admitted, however, that she had notes the victim had suffered "two bad falls"; 17) Hartman testified that Petitioner's counsel never interviewed her and she would have been willing to testify at trial;

18) Ben Holder, Petitioner's father, stated that he was never asked at trial about the victim's prior ATV accident, though he had discussed this with counsel; 19) Ben Holder stated the victim was a "rough and tumble" child and that statements about him having a busted lip were incorrect, because his lip was actually just chapped;

20) Marie Holder, Petitioner's mother, stated that she was at some of the meetings with counsel and that trial counsel said there was no time to focus on character witnesses because they had to focus on important issues; 21) Marie Holder said that she would have been able to provide a list of character witnesses;

22) Mary Holder said that Petitioner's ex-husband said that he had life insurance and wanted to pay for the victim's funeral; 23) numerous other witnesses, the majority of whom were relatives of the Petitioner, testified that they saw interactions between the Petitioner and the victim and had no cause for concern; 24) these witnesses said that they never saw the Petitioner with the co-defendant;

25) Petitioner's lead trial counsel, Bruce Byrholdt, testified that co-counsel associated

---

[6]The reference to "weeks" appears to be a scrivener's error since all of the evidence and testimony in the record indicates that it was "three months" not "three weeks", including the PCR court's reference to the last visit being in April 2002.



him on this case 4-6 weeks prior to trial; 26) Byrholdt testified that they had several meetings with the Petitioner and her family and they reviewed the State's evidence, the Petitioner's version of events, and the impact Petitioner's two statements would have on the defense case; 27) Byrholdt testified that the defense strategy was to prove the Petitioner was not aware of the co-defendant's abuse of the victim; 28) Byrholdt indicated the defense case was difficult because there was a dead child, the Petitioner gave conflicting statements, and Dr. Ward's testimony that the victim's injuries were horrendous and would have been apparent; 29) Byrholdt testified that there were no plea negotiations in this case; 30) Byrholdt testified that, after the Petitioner's statement was admitted at trial but before the pathologist testified, the trial judge brought up the idea of a guilty plea but that the State would not make any offers; 31) Byrholdt testified that Petitioner's co-workers and neighbors testified to seeing marks and burns on the victim, although there were multiple witnesses testifying about a single event; 32) Byrholdt testified that there was no basis to object to Center's testimony about burns because, as a lay witness, she could testify as to what she saw; 33) Byrholdt testified that they had discussed the victim's injuries with the Petitioner and she could not explain them; 34) Byrholdt did not recall whether she said the victim had eczema; 35) Byrholdt testified that they had reviewed the chiropractor's records, which indicated the victim had some marks when he visited; 36) Byrholdt testified that he did not call the chiropractor at trial because he did not want the victim's health care provider to testify regarding questionable marks and noted some people do not like chiropractors; 37) Byrholdt testified that he met with Dr. Ward, the pathologist, before trial and that Dr. Ward would not be helpful because he had said that these were the worst injuries he had ever seen; 38) Byrholdt testified that Dr. Ward said that the majority of the victim's injuries were recent and part of the contributing incident; 39) Byrholdt testified that while Dr. Ward said some of the



injuries were twelve hours old and the Petitioner left work that morning without checking on the victim, it did not help the case because of the testimony about the victim's prior injuries; 40) Byrholdt testified that he cross-examined Dr. Ward about a bite mark on the victim's wrist but admitted that he did not hire an expert or introduce evidence that DNA from the bite mark was male; 41) Byrholdt testified that this would not have helped the case because the DNA did not identify anyone in particular and the victim was not killed by a bite mark; 42) Byrholdt testified that the Petitioner gave two statements and, in the second one, she admitted she saw the co-defendant injure the victim and the victim's resulting injuries; 43) Byrholdt testified that he did not ask the Petitioner every possible question when she testified because he wanted her to simply tell her side of the story and what she witnessed; 44) Byrholdt testified that he discussed the prior ATV incident with the Petitioner and her family because it was mentioned in her first statement; 45) Byrholdt testified that he was not concerned with the prior ATV incident because it was not relevant to the time frame in this case; 46) Byrholdt testified that Johnny Parker's testimony put a different spin on the evidence but that it was all about how the jury perceived it; 47) Byrholdt testified that he did not make a motion in limine to limit the testimony of the Petitioner's ex-husband, Turner, on the grounds of relevancy, because there was nothing in his statement that hurt their case; 48) Byrholdt testified that he did not object to a question to Turner about whether he knew the victim's paternity because it was not harmful to the case; 49) Byrholdt testified that there were objections to the relevancy of questions to Turner about whether he paid for the victim's funeral and whether the Petitioner mistreated him; 50) Byrholdt testified that he was not concerned about the funeral issue and was satisified with the trial judge's statement to disregard because he does not like curative instructions that highlight issues to the jury; 51) Byrholdt confirmed that he asked Turner whether Petitioner "might have been not the best wife,



but [was] a good mother"; 52) Byrholdt testified that he was happy with the jury's question and that, while in hindsight he might have objected to the trial judge's answer, the judge was responsive to the question; 53) Byrholdt testified the "extreme indifference" language in the jury charge was both a correct statement of law and helpful to their case because there was no evidence to support the charge that Petitioner intended to harm the victim;

       54) David Phillips, Byrholdt's co-counsel, testified that he was retained three years after the incident, but was not the first attorney in this case; 55) Phillips testified that he associated Byrholdt before he accepted the case; 56) Phillips testified they had several meetings with the Petitioner and discussed the discovery materials, her version of events, and the impact her statements would have on the defense of the case; 57) Phillips testified that he and Byrholdt probably spent 150-200 ours on this case; 58) Phillips testified that the defense strategy was that the Petitioner was not aware of any harm inflicted on the victim and that the co-defendant was the abuser; 59) Phillips testified that they also reviewed the co-defendant's statement and that Johnny Parker would testify Petitioner knew about the abuse; 60) Phillips testified that the State never made a plea offer in this case and that the Petitioner was not interested in pleading guilty; 61) Phillips testified they did discuss the possibility of a guilty plea during the trial but the State rejected that idea; 62) Phillips testified that he had explained to the Petitioner that she was facing twenty (20) years to life imprisonment under one section and ten (10) to twenty (20) years under the other section; 63) Phillips testified they were aware a chiropractor had treated the victim; 64) Phillips testified that they did not present the chiropractor as a defense witness because the records indicated the victim had had bad falls and had stopped being brought to the Chiropractor three months before the victim's death; 65) Phillips testified contrary to Robin Center's testimony that she had previously called DSS because she

16



suspected abuse, noting that there were no such DSS records; 66) Phillips testified that he did not recall discussing character witnesses but that he felt comfortable with the defense case as it was; 67) Phillips testified that the defense case was to focus on hard evidence, not character evidence, and show that there was no reason for Petitioner to have harmed the victim; 68) Phillips testified that Petitioner mentioned a prior accident with the victim and an ATV in her first statement and they discussed this; 69) Phillips testified that Byrholdt conducted the direct examination of the Petitioner at trial and was not sure if they discussed the exact questions he would ask her; 70) Phillips testified Parker stated at trial that Petitioner knew of the abuse by the co-defendant; 71) Phillips testified he did not recall considering filing a motion in limine to exclude Parker's testimony, and noted the witness had favorable things to say about the Petitioner; 72) Phillips testified that he handled the closing argument and felt he presented their case to the jury well; 73) Phillips testified they had pictures of the victim a few weeks before his death (in which he appears uninjured) and that he tried to focus the jury on this sort of evidence and not on Parker's testimony; 74) Phillips testified he focused on the essence of the jury's question and not the trial judge's answer;

75) the PCR court found that Petitioner's testimony was not credible; 76) that trial counsel adequately conferred with the Petitioner, conducted a proper investigation, developed and implemented a trial strategy, and were thoroughly competent in their representation; 77) that Phillips was a more credible witness than Petitioner; 78) and that Petitioner failed to meet her burden of proving trial counsel did not properly investigate and counter the State's evidence;

79) With respect to witnesses, the Petitioner argued trial counsel should have pointed out to the jury that multiple witnesses were providing testimony about the same incident; 80) Byrholdt noted the State presented some cumulative witness testimony; 81) there was no error in how



trial counsel questioned these witnesses; 82) it was clear from the testimony that several witnesses saw the victim at a single event - whether it was at the Petitioner's workplace or the July 4th camping trip; 83) this information was before the jury, who weighed it in their determination of Petitioner's guilt;

84) Petitioner argued that trial counsel should have presented evidence that the victim did not have burn marks, but instead had eczema; 85) Byrholdt testified the Petitioner was never able to explain the victim's injuries and that he did not recall being told the victim had eczema; 86) there was no error; 87) trial counsel could not be expected to have argued this point if he was not aware the victim had eczema; 88) regardless, as there was an abundance of witness testimony about other bruises and abuse of the victim, the lack of testimony about the victim's eczema did not change the outcome of the trial;

89) Petitioner argued trial counsel should have objected to a witness' testimony that the victim had burn marks because she was not qualified to make that statement; 90) Byrholdt testified, however, there was no basis for such an objection because a lay witness can testify about what they observed; 91) trial counsel did not err in not objecting to a witness' testimony that she observed burn marks on the victim;

92) the Petitioner argued that trial counsel should have presented the victim's chiropractor to testify to his lack of injuries; 93) Phillips testified that they had reviewed the chiropractor's records but did not want to call her as a witness because the records indicated the victim had sustained several falls and the Petitioner stopped bringing the victim for visits three months before his death; 94) Byrholdt also testified they did not want to present the chiropractor as a witness because her notes indicated the victim had some marks on his body and many people do

18



not like chiropractors; 95) trial counsel articulated valid reasons for why they did not call the chiropractor as a witness at trial; 96) this was a legitimate trial decision because the chiropractor's records could have been harmful to the defense case;

97) the Petitioner argued trial counsel should have presented evidence to counter Robin Center's testimony that she had filed a previous DSS report; 98) Phillips confirmed there was no record of a DSS report; 99) however, there is no reasonable probability the outcome of the trial would have been different if Center was impeached with this information;

100) Petitioner failed to meet her burden of proving trial counsel should have better challenged the findings of the victim's autopsy report; 101) Petitioner argued trial counsel should have more thoroughly questioned Dr. Ward about the fact that some of the victim's bruises were 12 hours old; 102) Petitioner also argued trial counsel should have introduced the DNA report that found the DNA from the bite wound on the victim came from a male; 103) Byrholdt testified he knew Dr. Ward would not be a helpful witness in this case; 104) Byrholdt testified that he questioned Dr. Ward about the age of the bruises but that this information ultimately did not aid their case because of the other evidence of the victim's injuries; 105) Dr. Ward testified the victim's injuries were recent and the result of "fairly extensive" force; 106) Dr. Ward also testified that this was a compression injury - resulting in a torn intestine - and would have been painful; 107) Dr. Ward testified the victim's bruises appeared to be recent and received about the same time; 108) Byrholdt questioned Dr. Ward on cross-examination about the ages of the victim's injuries; 109) Byrholdt had Dr. Ward narrow the age of the bruises to 2-12 hours before death and also state the first blow to the victim (that damaged his internal organs) was greater than 12 hours and possibly a day old; 110) trial counsel properly cross-examined Dr. Ward to elicit testimony about the age of the victim's bruises; 111) as such, this



information was available to the jury to aid in their determination of whether the Petitioner was guilty of abusing, neglecting, and manifesting extreme indifference towards the victim; 112) regarding the DNA issue, the bite mark on the victim was one of the more minor injuries he suffered and did not factor into the cause of death; 113) based on the overwhelming evidence of the victim's serious injuries, there was no reasonable probability that the outcome would have been different in this case if the DNA report had been admitted into evidence;

114) Petitioner failed to meet her burden of proof that trial counsel should have called character witnesses at trial; 115) while the Petitioner argued trial counsel should have called character witnesses during the defense case at trial, Phillips testified the defense focus was to concentrate on the actual evidence instead of things such as character witnesses; 116) trial counsel were not deficient in failing to call character witnesses during the defense case; 117) the character witnesses who testified at Petitioner's PCR hearing all stated they had observed the Petitioner's interactions with the victim and that the Petitioner had a general reputation for truth and veracity; 118) given the overwhelming evidence of abuse and neglect of the victim presented at trial, there was no prejudice from the lack of character witness testimony;

119) Petitioner failed to meet her burden of proving trial counsel did not properly question her on direct examination in order to allow her to resolve some issues in the case; 120) Petitioner argued that trial counsel should have questioned her about the two statements she gave police in order to explain the differences in both the statements and the circumstances surrounding those statements; 121) Petitioner failed to meet her burden of proving error or resulting prejudice; 122) Byrholdt questioned the Petitioner on direct examination about the circumstances surrounding the two statements; 123) Petitioner also explained the statements (and circumstances) during her

20



cross-examination by both co-defendant's counsel and the State; 124) Petitioner failed to articulate what more trial counsel should have done in order to elicit more specific testimony about the statements during her direct examination; 125) regardless, there was no prejudice from the lack of a more specific direct examination because the Petitioner testified about the statements in full detail on cross-examination;

126) any error by trial counsel would be harmless in this case because the State presented overwhelming evidence of abuse and neglect of the victim; 127) trial counsel should have questioned her at trial about a prior ATV accident involving the victim - which explained why she initially believed the co-defendant's story that the victim was injured after another ATV accident; 128) Byrholdt and Phillips testified that they discussed the prior ATV accident with the Petitioner because it was mentioned in her first statement; 129) Byrholdt testified he was not concerned about the prior ATV accident because it was so far removed in time from the victim's death; 130) trial counsel did not err in failing to direct questions to the Petitioner about this issue; 131) Petitioner did not take the opportunity to volunteer information about the ATV incident during her direct testimony, despite Byrholdt's intention that her testimony was an opportunity for the Petitioner to tell her story; 132) Petitioner cannot prove resulting prejudice - especially since the various witnesses testified to seeing bruises and marks on the victim and Petitioner detailed long-term abuse of the victim in her second statement to the police;

133) the Petitioner argued trial counsel should have questioned her at trial about the time period immediately before the victim's death - that she had been sick the day before (which is why the victim's illness did not overly concern her) and she was too far away to check on him on her lunch break on the day he died; 134) the implication is that Petitioner would have been able to



mitigate the appearance that she overlooked the co-defendant's abuse of the victim; 135) given the overwhelming evidence of abuse and neglect of the victim presented at trial, there was no prejudice from trial counsel's failure to have the Petitioner testify about why she did not check on the victim before leaving for work that day or during her lunch break;

136) Petitioner failed to meet her burden of proving trial counsel did not properly handle issues related to her ex-husband; 137) Petitioner argued trial counsel should have filed a motion in limine to prevent the ex-husband from testifying and that counsel erred in how they handled the following issues relating to Parker: Byrholdt's statement that Petitioner "was not the best wife," testimony that the Petitioner mistreated him, questions about the victim's paternity, and testimony that Parker paid for the victim's funeral; 138) Byrholdt and Phillips testified they were not concerned about Parker as a witness because he had favorable things to say about the Petitioner and did not hurt their case; 139) Byrholdt testified that he was not concerned about the issues related to the victim's paternity and funeral because they were not prejudicial to the defense case; 140) the PCR Court examined the record and found Petitioner failed to prove either error with regard to issues concerning Parker or any resulting prejudice; 141) there was no error in counsel's decision not to file a motion in limine to prevent Parker's testimony on the grounds of relevance; 142) Phillips testified there was nothing in Parker's testimony that hurt their case; 143) a motion in limine is not a final ruling and would likely not have prevented Parker's testimony; 144) there was no error in counsel's handling of issues related to the victim's funeral and the Petitioner's treatment of Parker; 145) trial counsel made the proper objections on these issues at trial; 146) there was no error in counsel's failure to object to a question about the victim's paternity; 147) regardless, this questioning and corresponding answer did not harm the defense case; 148) there was no error in counsel's question



22

to Parker that the Petitioner "might have been not the best wife, but [was] a good mother"; 149) the overall effect of this question and answer was to highlight the potential bias of the witness against the Petitioner, yet point out his belief in her competence as a mother;

150) the Petitioner failed to meet her burden of proving trial counsel should have highlighted issues to the jury during closing argument; 151) in the amended PCR application, Petitioner argued trial counsel failed to state that she did not check on the victim on the day he died because she believed he was sick with the same illness she suffered the day before; 152) Petitioner testified at trial that she was sick the day before the victim's death and had not gone to work; 153) Petitioner gave detailed testimony on both direct and cross-examination but never stated she believed the victim was suffering from the same ailment; 154) Phillips presented an organized and thorough closing argument in which he argued the State had not proven the Petitioner's guilt; 155) Phillips never mentioned the Petitioner's previous illness as a reason for not checking on the victim before she went to work because this was not testified to at trial; 156) regardless, the Petitioner's testimony - including that she was ill the day before the victim died - was before the jury; 157) it was clear that, regardless of the strong argument put forth by trial counsel, the jury simply did not accept the Petitioner's version of events;

158) Petitioner failed to meet her burden of proving trial counsel should have objected to the portion of the jury charge that defined "extreme indifference" under the homicide by child abuse statute as "a mental state akin to intent characterized by a deliberate act culminating in death"; 159) Byrholdt testified this was a correct charge and actually helpful to the defense case, as he believed they had shown the Petitioner did not engage in deliberate acts toward the victim; 160) there was no reason for trial counsel to have objected to this language in the jury charge; 161) the Petitioner

23



failed to meet her burden of proving trial counsel should have objected to the trial judge's response

to a jury question; 162) the jury requested a copy of the homicide by child abuse statute and asked

"Does one verdict apply to both Defendants or could we render two different verdicts?"; 163) the jury

was brought into the courtroom and given an redacted copy of the statute; 164) the trial judge then

stated "[t]he answer to that question is, yes, you can find each Defendant guilty under Section A, or

you can find them both under - A(1) or both under A(2), or you can find one guilty of one and one

the other"; 165) the jury responded "yes" when asked if this answered their question; 166) Byrholdt

and Phillips testified they were pleased with the jury's question; 167) while Byrholdt stated that, in

retrospect, he may have objected to the judge's answer, he believed that answer was responsive to

the jury's question; 168) there was no error from counsel's decision not to object; 169) the jury

indicated that the trial judge's answer was responsive to their question;

     170) Petitioner failed to meet her burden to show that counsel's performance was

deficient and/or that she was prejudiced by counsel's performance; 171) Petitioner did not met her

burden to prove counsel failed to render reasonably effective assistance; and 172) as to any and all

allegations that were raised in the application or at the hearing in this matter and not specifically

addressed in the PCR Court's Order, the Petitioner failed to present any evidence regarding such

allegations and therefore waived them.  (R.pp. 980-994).  As previously noted, the South Carolina

Supreme Court denied Petitioner's PCR appeal wherein her counsel presented these issues and denied

the petition for rehearing.  See Holder v. State, Appellate Case No.  2012-212508 (Order filed July

24, 2014);  Holder v. State, Appellate Case No.  2012-212508 (Order filed August 22, 2014).

     Substantial deference is to be given to the state court's findings of fact.  Evans v.

Smith, 220 F.3d 306, 311-312 (4th Cir. 2000), cert. denied, 532 U.S. 925 (2001) ["We . . . accord



state court factual findings a presumption of correctness that can be rebutted only by clear and convincing evidence], cert. denied, 532 U.S. 925 (2001); Bell v. Jarvis, 236 F.3d 149 (4th Cir. 2000)(en banc), cert. denied, 112 S.Ct. 74 (2001).

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). See also Fisher v. Lee, 215 F.3d 438, 446 (4th Cir. 2000), cert. denied, 531 U.S. 1095 (2001); Frye v. Lee, 235 F.3d 897, 900 (4th Cir. 2000), cert. denied, 533 U.S. 960 (2001).

However, although the state court findings as to historical facts are presumed correct under 28 U.S.C. § 2254(e)(1), where the ultimate issue is a mixed question of law and fact, as is the issue of ineffective assistance of counsel, a federal court must reach an independent conclusion. Strickland v. Washington, 466 U.S. 668, 698 (1984); Pruett v. Thompson, 996 F.2d. 1560, 1568 (4th Cir. 1993), cert. denied, 114 S.Ct. 487 (1993) (citing Clozza v. Murray, 913 F.2d. 1092, 1100 (4th Cir. 1990), cert. denied, 499 U.S. 913 (1991)). Nevertheless, with regard to the ineffective assistance of counsel claims that were adjudicated on the merits by the South Carolina state court, this Court's review is limited by the deferential standard of review set forth in 28 U.S.C. §2254(d), as interpreted by the Supreme Court in Williams v. Taylor, 529 U.S. 362 (2000). See Bell v. Jarvis, supra; see also Evans, 220 F.3d at 312 [Under § 2254(d)(1) and (2), federal habeas relief will be granted with respect to a claim adjudicated on the merits in state court proceedings only where such adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States", or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

25



court proceeding"].  Therefore, this Court must be mindful of this deferential standard of review in considering Petitioner's ineffective assistance of counsel claims.

Where allegations of ineffective assistance of counsel are made, the question becomes "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Strickland</u>, 466 U.S. at 694.  In <u>Strickland</u>, the Supreme Court articulated a two prong test to use in determining whether counsel was constitutionally ineffective.  First, the Petitioner must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel's performance was below the objective standard of reasonableness guaranteed by the Sixth Amendment.  Second, the Petitioner must show that counsel's deficient performance prejudiced the defense such that the Petitioner was deprived of a fair trial.  In order to show prejudice a Defendant must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. <u>Mazzell v. Evatt</u>, 88 F.3d 263, 269 (4th Cir.1996).  For the reasons set forth and discussed hereinbelow, Petitioner has failed to meet her burden of showing that her counsel was ineffective under this standard.  <u>Smith v. North Carolina</u>, 528 F.2d 807, 809 (4ᵗʰ Cir. 1975)[Petitioner bears the burden of proving his allegations when seeking a writ of habeas corpus].

### Ground Two

In Ground Two, Petitioner contends that her counsel was ineffective in several ways in the handling of the state's witness Turner, and for characterizing Petitioner as "*not the best wife*" when cross-examining Turner.  However, Byrholdt testified that there was nothing in Turner's statement that hurt Petitioner.  (R.pp. 763-764).  Rather, he testified that it showed "[s]he was, if anything, a good mother."  (R.p. 763).  When Turner was questioned about whether Petitioner knew



who the victim's father was, Byrholdt testified that the testimony was not hurting the Petitioner and he saw no need to call attention to it by objecting. (R.pp. 765-766). With regard to Turner's testimony that he paid for the victim's funeral, Byrholdt testified that he did not find that testimony prejudicial to the Petitioner, and that the trial judge instructed the jury to disregard another question and answer about whether Petitioner had ever physically mistreated Turner. (R.pp. 771-774). Byrholdt testified that he did not ask for a curative instruction, because it would "ring the bell again." (R.p. 774). With regard to Byrholdt's question to Turner where he said she may not have been the best wife, but she was a good mother, Byrholdt testified that he was emphasizing that while they may have had problems, that the Petitioner was a good mother. (R.pp. 775-776).

Petitioner offers nothing other than pure speculation that if counsel had objected earlier to Turner's testimony and/or not used the phrase "*not the best wife*", that would have affected the outcome of the case. Such speculation or conjecture is insufficient to show counsel was ineffective. While the decisions of trial counsel are always subject to being second guessed with the benefit of hindsight, tactical and strategic choices made by counsel after due consideration do not constitute ineffective assistance of counsel. Strickland, 466 U.S. at 689. There is a strong presumption that counsel's conduct during trial was within the wide range of reasonable professional assistance, and this Court should not scrutinize counsel's performance by looking at the decisions made in an after the fact manner. Id. at 688-689; Bunch v. Thompson, 949 F.2d 1354 (4th Cir. 1991), cert. denied, 505 U.S. 1230 (1992); Horne v. Peyton, 356 F.2d 631, 633 (4th Cir. 1966), cert. denied, 385 U.S. 863 (1966); Burger v. Kemp, 483 U.S. 776 (1987); see also Harris v. Dugger, 874 F.2d 756, 762 (11th Cir. 1989), cert. denied, 493 U.S. 1011 (1989) [An informed decision by trial counsel should not be second guessed by a reviewing court.].

27



Accordingly, Petitioner has not carried her burden of showing that her counsel was ineffective for failing to object earlier or make a motion in limine with regard to Turner's testimony, or that counsel's conduct was otherwise ineffective. <u>Smith</u>, 528 F.2d at 809 [Petitioner bears the burden of proving his allegations when seeking a writ of habeas corpus]. Therefore, Petitioner has not shown that the findings and rulings of the state courts were unreasonable. <u>Evans</u>, 220 F.3d at 312; <u>Williams v. Taylor</u>, <u>supra</u>; <u>Strickland v. Washington</u>, <u>supra</u>.; <u>Greene v. Fisher</u>, 132 S.Ct. 38, 43 (2011)[observing that AEDPA's "standard of 'contrary to, or involv[ing] an unreasonable application of, clearly established Federal law' is difficult to meet, because its purpose] is to ensure that federal habeas relief functions as guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction"]. This claim should be dismissed.

### Ground Three

In Ground Three Petitioner alleges that her counsel was ineffective for failing to reference evidence during his closing argument that Petitioner was sick herself the day before the victim died and therefore had reason to believe that the child had a similar illness. Petitioner also alleges that counsel should have highlighted that the numerous witnesses who testified they saw bruising on the victim were all referring to a very limited number of incidents. These claims were presented to the PCR court, which found that counsel:

> presented an organized and thorough closing argument in which he argued the State had not proven the [Petitioner's] guilt. Phillips [counsel] never mentioned the [Petitioner's] previous illness as a reason for not checking on the victim before she went to work because this was not testified to at trial. Regardless, the [Petitioner's] testimony - including that she was ill the day before the victim died - was before the jury. It is clear that, regardless of the strong argument put forth by trial counsel, the jury simply did not accept [Petitioner's] version of events.

(R.p. 992).



No error has been shown with respect to this finding. When a habeas petitioner challenges the evidence summarized during closing argument, the question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Here, the record shows that Phillips made a comprehensive closing argument in which he argued that the State failed to produce any evidence that Petitioner was responsible for the victim's abuse or neglect, that she was aware of the injuries leading to death, or that she had manifested extreme indifference towards the victim. (R.pp. 630-639). Instead, counsel blamed the co-defendant, Martucci, emphasizing that Petitioner was at work during the victim's final hours and that Petitioner could not be responsible for the crime. (R.pp. 633-634). Counsel also showed and emphasized the victim's pictures taken in weeks prior to his death, which showed no bruising. (R.pp. 634-635). Counsel's closing argument was aimed at creating reasonable doubt and highlighted the lack of evidence directly linking Petitioner to the victim's death. (R.pp. 630-639). Cf. Griffin v. Delo, 33 F.3d 895, 903 (8th Cir. 1994) [Finding "[t]here [was] no reason to conclude that a longer or more passionate closing argument would have resulted in an alternative sentence."].

With regard to Petitioner's assertion that counsel should have emphasized that Petitioner felt sick the night before the victim's death and therefore was justified in believing that he was suffering from the same illness, that testimony was not in the evidence. While Petitioner testified at the PCR hearing that she had been sick and thrown up three times and had diarrhea and had stated in one of her statements to the police that she was sick to her stomach and was really nervous that day, she stated the reason she stayed home was because of her stomach and because "[h]e was in a bad mood and I felt like I better stay home." Petitioner testified at the PCR hearing that the victim



got sick "later that night". (R.pp. 527, 866). However, Petitioner never testified at trial that she believed the victim was suffering from the same illness that she alleged she had the day before the victim died; (R.pp. 542-589); and Petitioner has failed to show how counsel committed error in dealing with her testimony. Cf. United States v. Caver, 470 F.3d 220, 244 (6th Cir. 2006) [Noting that "not drawing attention to [a] statement may be perfectly sound from a tactical standpoint. . . ."]. Petitioner has also not shown that counsel was ineffective for focusing on the events immediately leading up to the victim's death and failing to include references to show that the multiple witnesses were only referring to a limited number of incidents. There is no indication of confusion in this regard in the witness testimony.

Accordingly, Petitioner has also not carried her burden of showing that her counsel was ineffective for failing to include these other matters in his closing argument, or that the findings and rulings of the state courts were unreasonable. Smith, 528 F.2d at 809 [Petitioner bears the burden of proving his allegations when seeking a writ of habeas corpus]; Evans, 220 F.3d at 312; Williams v. Taylor, supra; Strickland v. Washington, supra.; Greene, 132 S.Ct. at 43 [observing that AEDPA's "standard of 'contrary to, or involv[ing] an unreasonable application of, clearly established Federal law' is difficult to meet, because its purpose] is to ensure that federal habeas relief functions as guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction"]. This claim should be dismissed.

### Ground Four

In Ground Four, Petitioner contends that counsel was ineffective for failing to call numerous character witnesses at trial. Counsel Phillips testified at the PCR hearing that they did not focus on character witnesses, but instead focused on the hard evidence that they were dealing with



the death of a two year old child and the fact that Petitioner did not have a very good explanation to work with as to how it happened or how she could not have known about it happening. (R.p. 818). When Phillips was asked whether counsel considered presenting testimony from others in the community who had observed the Petitioner together with the victim, he testified that they were more focused on the events that happened more proximate to the time and date of the victim's death. (R.p. 820). The PCR court found that trial counsel was not deficient for failing to call character witnesses, noting that the witnesses who testified at the PCR hearing all stated they had observed the Petitioner's interactions with the victim and that the Petitioner had a general reputation for truth and veracity. The PCR court further held that, given the overwhelming evidence of abuse and neglect of the victim presented at trial, there was no prejudice from the lack of this character witness testimony. (R.pp. 988-989). The undersigned agrees.

At the PCR hearing, Byrholdt testified that he met with Petitioner, her parents, went over the discovery material provided by the State, and met with the pathologists. (R.p. 756). Phillips testified that they thoroughly went through the discovery materials and probably spent between 150 and 200 hours in preparation for the case during the month or two before the trial. (R.pp. 823-824). Given the overwhelming evidence of Petitioner's guilt [see discussion, supra], Petitioner's counsel chose a strategy of focusing on the hard evidence and challenging that evidence, including focusing more on the events proximate in time to the child's death. Additionally, Respondent points out that, given the number of witnesses who had previously seen bruising on the victim, all of these character witnesses would also have been subjected to cross examination as to whether they also had observed this bruising.

"Capable lawyers evaluate not only what they ought to do, but what they ought not to



do.  Where action on behalf of a client has a considerable likelihood of backfiring, they avoid it."
Stanley v. Schriro, 598 F.3d 612, 636 and n. 28 (9th Cir. 2010).  That is what trial counsel did in this

case, and Petitioner has  not carried her burden of showing that her counsel was ineffective for failing

to call these witnesses.  Smith, 528 F.2d at 809 [Petitioner bears the burden of proving his allegations

when seeking a writ of habeas corpus].  Therefore, Petitioner has not shown that the findings and

rulings of the state courts were unreasonable, or that her counsel was ineffective.  Evans, 220 F.3d

at 312; Williams v. Taylor, supra; Strickland v. Washington, supra.; Greene, 132 S.Ct. at 43

[observing that AEDPA's "standard of 'contrary to, or involv[ing] an unreasonable application of,

clearly established Federal law' is difficult to meet, because its purpose] is to ensure that federal

habeas relief functions as guard against extreme malfunctions in the state criminal justice systems,

and not as a means of error correction"].  This claim should be dismissed.

### Ground Five

In Ground Five, Petitioner contends that her counsel was ineffective for neglecting to

introduce evidence, specifically a SLED forensic Services Lab Report documenting that there was

a mixed DNA sample taken from bite marks on the victim which yielded DNA not inconsistent with

the victim *and* DNA from an unknown individual with XY Amelogenin meaning the DNA came

from an unknown *male* contributor.  However, Byrholdt testified that the SLED report showing that

the bite mark was from a male was not valuable because it was not the bite mark that killed the child,

nor had the State tried to identify Petitioner as being responsible for the bite mark.  (R.p. 796).

Rather, as previously discussed, counsel decided to focus on the injuries proximate in time that led

to the victim's death.  Further, when Byrholdt was questioned about his handling of Dr. Ward,

Byrholdt testified that Dr. Ward was not going to help the Petitioner in any way; that when they met



with Dr. Ward he told them that it was the worst case of child abuse that he had ever seen, that the victim's vital organs had been ripped away, and that Dr. Ward was a hell of a witness against the Petitioner. (R.pp. 791-792).

In sum, although Petitioner speculates that if counsel had introduced evidence regarding the DNA findings that would have affected the outcome of the case, she has presented no cogent argument to show her counsel was ineffective. The Court has already highlighted some of the testimony relating to the horrific injuries in the evidence which caused the victim's death, none of which relates to the bite mark. See discussion, supra. Again, while the decisions of trial counsel are always subject to being second guessed with the benefit of hindsight, tactical and strategic choices made by counsel after due consideration do not constitute ineffective assistance of counsel. Strickland, 466 U.S. at 689. There is a strong presumption that counsel's conduct during trial was within the wide range of reasonable professional assistance, and this Court should not scrutinize counsel's performance by looking at the decisions made in an after the fact manner. Id. at 688-689; Bunch v. Thompson, 949 F.2d 1354 (4th Cir. 1991), cert. denied, 505 U.S. 1230 (1992); Horne v. Peyton, 356 F.2d 631, 633 (4th Cir. 1966), cert. denied, 385 U.S. 863 (1966); Burger v. Kemp, 483 U.S. 776 (1987); see also Harris v. Dugger, 874 F.2d 756, 762 (11th Cir. 1989), cert. denied, 493 U.S. 1011 (1989) [An informed decision by trial counsel should not be second guessed by a reviewing court.].

Petitioner has not shown that the findings and rulings of the state courts were unreasonable, or that her counsel was ineffective. Evans, 220 F.3d at 312; Williams v. Taylor, supra; Strickland v. Washington, supra.; Greene v. Fisher, 132 S.Ct. at 43 [observing that AEDPA's "standard of 'contrary to, or involv[ing] an unreasonable application of, clearly established Federal



law' is difficult to meet, because its purpose] is to ensure that federal habeas relief functions as guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction"]. This claim should be dismissed.

**Ground Six**

With regard to Petitioner's allegations in Ground Six, Petitioner contends that trial counsel was ineffective for failing to object to a confusing and incomplete answer given by the trial judge in response to a question from the jury. The record reflects that during the jury deliberations, the jury sent out the question: "Does one verdict apply to both Defendants or could we render two different verdicts?" (R.pp. 689, 691). The trial judge responded to this question as follows: "The answer to that question is, yes, you can find each Defendant guilty under Section A, or you can find them both under – (A)(1) or both under (A)(2), or you can find one guilty of one and one the other". (R.p. 691).

Petitioner contends that trial counsel was ineffective for failing to object to this response since the trial judge did not refer to any options finding one or both of the defendants innocent. Petitioner also contends that the judge's failure to give an option involving a finding of innocent could have constituted an indication to the jury that the judge believed the Petitioner to be guilty. See Memorandum in Opposition to Summary Judgment, p. 16. However, the PCR court considered this issue and found that Petitioner failed to meet her burden of proof and that there was no error from counsel's decision not to object, noting also that the jury said that the trial's judge response answered their question. (R.pp. 993-994).

The undersigned finds no reversible error in this conclusion. The transcript reflects that during the jury instructions, the Court instructed the jury as follows:

34



> Ladies and gentlemen, there are one of three possible verdicts in this case. The first possible verdict is guilty of homicide by child abuse under circumstances manifesting an extreme indifference to human life. The second possible verdict is guilty of homicide by child abuse by knowingly aiding and abetting another person to commit child abuse or neglect. The third possible verdict is not guilty.

(R.p. 686).

The trial judge had also emphasized three possible verdicts by providing the jury a sheet of paper in the deliberation room which spelled out each potential outcome:

> Madam Forelady, I have written out on a separate sheet of paper the three possible verdicts in this case. I do that simply to assist you in writing out whatever the unanimous verdict of the jury is. You should attach no significance to the sequence in which I have listed these verdicts.

(R.p. 687).

When the question was sent from the jury and the trial judge provided the response outlined above, he followed up by inquiring as to whether his response answered their question, to which all jurors responded "yes." (R.p. 691). At the PCR hearing, Byrholdt testified that he was happy with the question from the jury, and that although with the benefit of hindsight he guessed he should have objected, that the judge's response answered the question the way it was asked. (R.p. 802). Co-counsel Phillips testified that there was no particular reason that he didn't object, "other than I think my mind unfortunately went to what I think the jury was asking, the essence of the question rather than the specifics of how it was worded. I think I probably made the same error in judgment in hindsight that Mr. Byrholdt did." (R.p. 827).

In sum, neither counsel believed at the time an objection was necessary, although in hindsight they suppose that one could have been made. On federal habeas review, the court "will neither second guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight."



Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1994); Smith v. Stewart, 140 F.3d 1263, 1273 (9th Cir. 1998)["[W]e must resile from present counsel's attempt to lure us into the hindsight miasma that the Supreme Court has told us to avoid."].  In any event, even assuming arguendo that counsel should have objected and requested additional instruction from the trial judge in answering the jury's question, Petitioner has not shown the necessary prejudice for her counsel's actions and/or inactions. As previously discussed, the evidence of Petitioner's guilt was overwhelming, the jury said that the trial judge answered their question, and the Court had already specifically instructed the jury that one possible verdict was "not guilty" and had provided a verdict sheet with this option on it for the jury to fill out.  Petitioner has not carried her burden of showing that her counsel was ineffective for failing to object and request additional instructions from the trial judge.  Smith, 528 F.2d at 809 [Petitioner bears the burden of proving his allegations when seeking a writ of habeas corpus].

Therefore, Petitioner has not shown that the findings and rulings of the state courts were unreasonable, or that her counsel was ineffective.  Evans, 220 F.3d at 312; Williams v. Taylor, supra; Strickland v. Washington, supra.; Greene v. Fisher, 132 S.Ct. at 43 [observing that AEDPA's "standard of 'contrary to, or involv[ing] an unreasonable application of, clearly established Federal law' is difficult to meet, because its purpose] is to ensure that federal habeas relief functions as guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction"].  This claim should be dismissed.

### Conclusion

Based on the foregoing, it is recommended that the Respondent's motion for summary judgment be **granted**, and that the Petition be **dismissed**, with prejudice.

36



The parties are referred to the Notice Page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

July 17, 2015
Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

